**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HUMANS & RESOURCES, LLC, | : | |
| d/b/a CADENCE RESTAURANT, | : | CIVIL ACTION |
| | : | |
| Plaintiff | : | |
| | : | NO. 20-CV-2152 |
| vs. | : | |
| | : | |
| FIRSTLINE NATIONAL INSURANCE | : | |
| COMPANY, | : | |
| | : | |
| Defendant | : | |

**MEMORANDUM AND ORDER**

**JOYNER, J.**                                          **January  8 , 2021**

     This is an action seeking a declaratory judgment that
Defendant Firstline National Insurance Company owes benefits to
Plaintiff under a Businessowner "all-risk" policy of insurance
issued by Firstline and in effect between January 1, 2020
through January 1, 2021. More particularly, Plaintiff is seeking
to recover for the business interruption losses it suffered as a
consequence of the Coronavirus/Covid 19 pandemic closure orders
issued by the Governor of Pennsylvania and the Mayor of
Philadelphia, among others.  Defendant has moved to dismiss this
action with prejudice on the grounds that Plaintiffs' claims are
excluded under the policy at issue.  For the reasons which
follow, the motion to dismiss shall be denied.

## Factual Background

According to the allegations contained in Plaintiff's Amended Complaint, Plaintiff is the owner of the Cadence Restaurant located on Girard Avenue in Philadelphia, which prior to the pandemic, had operating hours on Tuesdays through Thursdays from 5:30 – 9:30 p.m., on Fridays from 5:30 – 10:00 p.m. and Saturdays from 5:00 – 10:00 p.m. The restaurant was closed on Sundays and Mondays and had indoor seating capacity for 40 diners.  "On or about January 1, 2020, Defendant entered into a contract of insurance with Plaintiff whereby Plaintiff agreed to make payments to Defendant in exchange for Defendant's promise to indemnify the Plaintiff for losses including, but not limited to, business income losses at its restaurant located in Philadelphia…" (Pl's Am. Compl., para. 12).  Plaintiff avers, *inter alia*, that it purchased the all-risk policy from Defendant "with an expectation that it was purchasing a policy that would provide coverage in the event of business interruption and extended expenses, such as that suffered by Plaintiff as a result of Covid 19."  (Pl's Am. Compl., para. 27).

As further alleged in the amended complaint, on March 11, 2020, the World Health Organization declared Covid 19 to be a worldwide pandemic.  (Pl's Am. Compl., para. 43).  This declaration was pre-dated by the Proclamation of Disaster Emergency issued on March 6, 2020 by Pennsylvania Governor Tom

Wolf formally recognizing the existence of an emergency situation in the Commonwealth of Pennsylvania due to Covid 19 and was followed shortly thereafter by the closure of all non-essential, non-life sustaining businesses by the City of Philadelphia on March 16, 2020.  (Pl's Am. Compl., para. 50-51).  Similar closure Orders from both Philadelphia and the Commonwealth of Pennsylvania followed on March 19 and 22, 2020 and, on March 23, Governor Wolf issued the first of several stay-at-home Orders directed first to the residents of Allegheny, Bucks, Chester, Delaware, Monroe, Montgomery and Philadelphia Counties, and subsequently on April 1, 2020, to all Pennsylvania residents. (Am. Compl., para. 52-55).

Plaintiff did not have the option of disobeying these Orders for fear of penalties and sanctions and it ceased its regular business operations on March 16, 2020.  (Pl's Am. Compl., para. 59-61).  Plaintiff's restaurant remained closed for several months, after which it was permitted to re-open on a part-time, limited basis with restricted hours from Thursdays through Saturdays.  (Am. Compl., para. 61-62).  Plaintiff contends that because Covid 19 made the Cadence Restaurant unusable in the way that it had been used before the pandemic and because it derives most of its revenue from in-restaurant seating and business, it has suffered losses within the coverage parameters of its policy with Defendant.  (Pl's Am. Compl.,

para. 64-72).  Insofar as Defendant denied Plaintiff's claim for business interruption benefits, Plaintiff commenced this action in May 2020 to obtain a declaration that its restaurant was covered for all of the business income losses that it had incurred as a result of its forced closure.  An amended complaint was filed on October 29, 2020 which Defendant now seeks to dismiss alleging that it fails to state a claim upon which relief can be granted.

## Standards Governing Rule 12(b)(6) Motions

It is well-settled that to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and "enough factual allegations to 'state a claim to relief that is plausible on its face.'"  Doe v. University of the Sciences, 961 F.3d 203, 208 (3d Cir. 2020)(quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed.2d 929 (2007) and Fed. R. Civ. P. 8(a)(2)).  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed.2d 868 (2009).  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice.  Id.  In deciding a motion

to dismiss, the courts are to accept as true all of the factual allegations in the complaint, viewing them in the light most favorable to the non-moving party and consider any exhibits attached to the complaint and matters of public record.  Doe, supra, (citing Umland v. PLANCO Fin. Servs., Inc., 542 F.3d 59, 64 (3d Cir. 2008) and Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

## Discussion

In filing its motion to dismiss, Defendant Firstline National Insurance Company ("Firstline") contends that because the Businessowners Policy which it issued to Plaintiff provides coverage only for losses caused by direct physical loss of or damage to property, broadly excludes coverage for business income losses caused by or resulting from a virus and the criteria for invocation of Civil Authority coverage have not been satisfied, Plaintiff has no legal basis on which to claim benefits and its amended complaint is properly dismissed. Plaintiff responds that since it purchased an "All Risk" business interruption policy which was intended "to help it weather any potential financial storm caused by a forced closure," it is entitled to coverage for the losses incurred as a consequence of its forced closure due to the current pandemic.

## A. Whether Plaintiff's Claim Fails Under the Policy as Written

Defendant argues that the Plaintiff's claims are barred under the policy's exclusions and/or are not covered under the terms and conditions as written.  Specifically, Defendant makes this argument in reliance upon the language of the Business Income and Extra Expense provisions, the Civil Authority provision and the Virus Exclusion.

"The task of interpreting an insurance contract is generally performed by a court rather than by a jury."  401 Fourth Street, Inc. v. Investors Insurance Group, 583 Pa. 445, 454, 879 A.2d 166, 171 (2005).  In insurance disputes such as here presented where the gist of the action is the alleged wrongful denial of coverage, the claim is properly analyzed in three steps: 1) whether Plaintiff's claim falls within the scope of coverage; 2) whether the Defendant has raised any affirmative defenses, such as a policy exclusion; and 3) whether there are any applicable exemptions from the exclusion.  Wilson v. Hartford Casualty Co., Civ. A. No. 20-3384, 2020 U.S. Dist. LEXIS 179896 at *15, 2020 WL 5877577 (E.D. Pa. Sept. 30, 2020)(citing, inter alia, Couch on Insurance ch. 245 (3d ed. 2020)).  Indeed, "the insured bears the initial burden" in insurance coverage disputes "to make a prima facie showing that the claim falls within the policy's grant of coverage, but if

the insured is able to make this showing, the insurer then bears the burden of demonstrating that a policy exclusion excuses the insurer from providing coverage if the insurer contends that it does." State Farm Fire & Casualty Co. v. Estate of Mehlman, 589 F.3d 105, 111 (3d Cir. 2009)(citing Koppers Co. v. Aetna Casualty & Surety Co., 98 F.3d 1440, 1446 (3d Cir. 1996)).

"In interpreting the relevant provisions of … insurance policies …," the courts are "guided by the polestar principle that insurance policies are contracts between an insurer and a policyholder" and thus "traditional principles of contract interpretation" are to be applied "in ascertaining the meaning of the terms used therein." Kurach v. Truck Ins. Exchange, 2020 Pa. LEXIS 4405 at *19 - *20, 235 A.3d 1106, 1116 (Pa. 2020); Gallagher v. Geico Indemnity Company, 650 Pa. 600, 611, 201 A.3d 131, 137 (Pa. 2019).  In Pennsylvania[1], "[c]ontract interpretation is a question of law that requires the court to ascertain and give effect to the intent of the contracting parties as embodied in the written agreement." Department of Transportation v. Pennsylvania Industries for the Blind and Handicapped, 2005 Pa. Commw. LEXIS 638, 886 A.2d 706, 711 (Pa.

---

[1] As jurisdiction in this matter is premised upon diversity of citizenship, Pennsylvania substantive law applies here.  Motorists Mutual Insurance Co. v. Hardinger, No. 04-1750, 131 Fed. Appx. 823, 825, 2005 U.S. App. LEXIS 9030, *4 (3d Cir. May 18, 2005)(citing Nowak By and Through Nowak v. Faberge USA, Inc., 32 F.3d 755, 757 (3d Cir. 1994)).

Cmwlth. 2005)(citing Robert F. Felte, Inc. v. White, 451 Pa.
137, 144, 302 A.2d 347, 351 (1973)).  A court should not
consider individual terms in isolation, but rather must consider
the entire insurance provision to ascertain the parties' intent.
401 Fourth Street, Inc., 583 Pa. at 455, 879 A.2d at 171.
Further, "[c]ourts assume that a contract's language is chosen
carefully and that the parties are mindful of the meaning of the
language used." Steuart v. McChesney, 498 Pa. 45, 51, 444 A.2d
659, 662; Baron v. Quad Three Group, Inc., 2013 Pa. Super. LEXIS
612, 64 A.3d 283 (2013).  "When a writing is clear and
unequivocal, its meaning must be determined by its contents
alone." Steuart, id; Murphy v. Duquesne University of the Holy
Ghost, 565 Pa. 571, 591, 777 A.2d 418, 429 (2001)).

It has been said that a contract contains an ambiguity "if
it is reasonably susceptible of different constructions and
capable of being understood in more than one sense." Murphy,
777 A.2d at 430 (quoting Hutchison v. Sunbeam Coal Co., 513 Pa.
192, 519 A.2d 385, 390 (1986)).  "This is not a question to be
resolved in a vacuum" but "[r]ather, contractual terms are
ambiguous if they are subject to more than one reasonable
interpretation when applied to a particular set of facts."
Madison Construction Co. v. Harleysville Mutual Insurance Co.,
557 Pa. 595, 606, 735 A.2d 100, 106 (1999)  Nor should courts
"distort the meaning of the language or resort to a strained

contrivance in order to find an ambiguity." Id.  However, "[w]here a provision of [an insurance] policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement." Prudential Property & Casualty Insurance Co. v. Sartno, 588 Pa. 205, 217, 903 A.3d 1170, 1177 (2006); Standard Venetian Blind Co. v. American Empire Insurance Co., 503 Pa. 300, 469 A.2d 563, 566 (1983).  But where the language of the contract is clear and unambiguous, a court is required to give effect to that language.  Prudential, id,(citing Gene & Harvey Builders, Inc. v. Pennsylvania Mfrs. Ass'n Ins. Co., 512 Pa. 420, 517 A.2d 910, 913 (1986).

    *1.* Business Income Loss, Extra Expense and Civil Authority Coverages

Accordingly, we must begin our analysis by looking first to the language of the policy at issue to determine whether Plaintiff's claim falls within the scope of coverage.[2]  In so doing, we find that the "Businessowners Coverage Form," Form BP 00 03 07 13, under the heading "Business Income," provides in relevant part at Section A, Subsection 5 (f)(1)(a), on page 6 of 53[3] as follows:

---

[2] A copy of the insurance policy is attached as Exhibit "A" to Defendant's Answer to Plaintiff's original Complaint (ECF Doc. No. 6).

[3] Under Subsection H entitled "Property Definitions:"

We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. …

The policy goes on to read under the heading: "Extended Business Income" at subsection f(2) on page 7 of 53:

(a)   If the necessary suspension of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:

(i)   Begins on the date property except finished stock is actually repaired, rebuilt or replaced and "operations" are resumed; and

(ii)   Ends on the earlier of:

---

"Operations" means your business activities occurring at the described premises," and "Period of Restoration"

a. Means the period of time that:

(1)   Begins:

(a)   72 hours after the time of direct physical loss or damage for Business Income Coverage; or
(b)   Immediately after the time of direct physical loss or damage for Extra Expense Coverage;

Caused by or caused by any Covered Cause of Loss at the described premises and

(2)   Ends on the earlier of:

(a)   The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

(b)   The date when business is resumed at a new permanent location.

Pages 33-34 of 53.

10

    i.    The date you could restore your "operations", with reasonable speed, to the level which would generate the Business Income amount that would have existed if no direct physical loss or damage had occurred; or

    ii.   60 consecutive days after the date determined in Paragraph (a)(i) above, unless a greater number of consecutive days is shown in the Declarations.

However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss[4] in the area where the described premises are located.

(b)   Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.
…

"Extra expense" coverage is outlined on page 8 of 53 in

subsection g(1) as follows:

We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the described premises.  The loss of damage must be caused by or result from a Covered Cause of Loss. …

Under the Civil Authority provision, which is set forth in

subsection I on page 9,

---

[4] "Covered Causes of Loss" is defined in Section A, Subsection 3 as being: "Direct physical loss unless the loss is excluded or limited under Section I – Property." (See, ECF Doc. No. 6, Exhibit "A," at p. 2 of 53).  This definition is echoed by Plaintiff in its First Amended Complaint at paragraph 19:

The Policy is an all-risk policy, insofar as it provides that covered causes of loss under the policy means direct physical loss or direct physical damage unless the loss is specifically excluded or limited in the policy.

When a Covered Cause of Loss causes damage to property
other than property at the described premises, we will pay
for the actual loss of Business Income you sustain and
necessary Extra Expense caused by action of civil authority
that prohibits access to the described premises, provided
that both of the following apply:

(1)   Access to the area immediately surrounding the damaged
      property is prohibited by civil authority as a result
      of the damage, and the described premises are within
      that area but are not more than one mile from the
      damaged property; and

(2)   The action of civil authority is taken in response to
      dangerous physical conditions resulting from the
      damage or continuation of the Covered Cause of Loss

(3)   that caused the damage, or the action is taken to
      enable a civil authority to have unimpeded access to

(4)   the damaged property.

Civil Authority Coverage for Business Income will begin 72
hours after the time of the first action of the civil
authority that prohibits access to the described premises
and will apply for a period of up to four consecutive weeks
from the date on which such coverage began.

Civil Authority Coverage for necessary Extra Expense will
begin immediately after the time of the first action of
civil authority that prohibits access to the described
premises and will end:

(1)   Four consecutive weeks after the date of that action;
      or;

(2)   When your Civil Authority Coverage for Business Income
      ends;

      whichever is later.  …


Several of our colleagues on this Court and the adjoining

District of New Jersey have also been recently confronted with

pandemic-related business interruption claims made under

policies with language nearly identical to that presented here.
See, e.g., Toppers Salon & Health Spa, Inc. v. Travelers
Property Casualty Company of America, Civ. A. No. 20-cv-3342,
2020 U.S. Dist. LEXIS 223356, 2020 WL 7024287 (E.D. Pa. Nov. 30,
2020)(Wolson, J.); Brian Handel D.M.D., P.C. v. Allstate
Insurance Co., Civ. A. No. 20-3198, 2020 U.S. Dist. LEXIS 207892
at *5 - *6, 2020 WL 6545893 (E.D. Pa. Nov. 6, 2020)(Bartle, J.);
N & S Restaurant LLC v. Cumberland Mutual Fire Insurance Co.,
Civ. No. 20-05289 (RBK/KMW), 2020 U.S. Dist. LEXIS 206972, 2020
WL 6501722 (D.N.J. Nov. 5, 2020)(Kugler, J.); Wilson v. Hartford
Casualty Co., Civ. A. No. 20-3384, 2020 U.S. Dist. LEXIS 179896,
2020 WL 5877577 (Sept. 30, 2020)(Robreno, J.).  In resolving the
issue of the meaning of "physical loss or damage," nearly all
looked to the decision issued in Port Authority of New York &
New Jersey v. Affiliated Insurance Co., 311 F.3d 226 (3d Cir.
2002) for guidance.  In that case, Plaintiffs sued to recover
the expenses incurred in the abatement of asbestos-containing
materials in a number of their structures, alleging that those
expenses fell within the scope of a first party, "all risks"
insurance policy covering "physical loss or damage." Noting the
scarcity of case law addressing asbestos contamination claims
under first party insurance contracts and that in the insurance
industry "all risks" does not mean "every risk," the Third
Circuit went on to observe:

> In ordinary parlance and widely accepted definition,
> physical damage to property means "a distinct,
> demonstrable, and physical alteration" of its structure.
> Fire, water, smoke and impact from another object are
> typical examples of physical damage from an outside source
> that may demonstrably alter the  components of a building
> and trigger coverage.  Physical damage to a building as an
> entity by sources unnoticeable to the naked eye must meet a
> higher threshold.

Id, at 235.  In affirming the District of New Jersey's grant of
summary judgment in favor of the insurer, the Third Circuit
adopted that court's articulation of the standard for "physical
loss or damage" to a structure caused by asbestos contamination
as proper.  That is,

> that 'physical loss or damage' occurs only if an actual
> release of asbestos fibers from asbestos-containing
> materials has resulted in contamination of the property
> such that its function is nearly eliminated or destroyed,
> or the structure is made useless or uninhabitable, or if
> there exists an imminent threat of the release of a
> quantity of asbestos fibers that would cause such loss of
> utility.

Id, at 236.

Although the Port Authority decision was rendered in
application of the laws of New Jersey and New York, the Third
Circuit has nevertheless predicted that the Pennsylvania Supreme
Court would adopt a similar rationale, albeit in an unpublished
decision.  In Motorists Mutual Insurance Co. v. Hardinger, No.
04-1750, 131 Fed. Appx. 823, 2005 U.S. App. LEXIS 9030 (3d Cir.
May 18, 2005), the Third Circuit applied the Port Authority
standard and reversed the entry of summary judgment in favor of

the plaintiff insurer and found that a genuine issue of material
fact existed as to whether the presence of e-coli bacteria in
the well of the insureds' home nearly eliminated or destroyed
the home's functionality so as to constitute a "physical loss"
within the meaning of the policy. 131 Fed. Appx. at 826.

In his December 3, 2020 decision in 4431, Inc. v.
Cincinnati Insurance Co., No. 5:20-cv-4396, 2020 U.S. Dist.
LEXIS 226984, 2020 WL 7075318 (E.D. Pa. Dec. 3, 2020), Judge
Leeson was tasked with adjudicating Defendant's motion to
dismiss an action seeking a declaratory judgment that the
plaintiff operators of bar and dine-in services at several
Pennsylvania restaurants were covered for the revenue losses
which they had sustained as a result of the Governor's pandemic
closure orders.  In addition to relying upon the Port Authority
and Motorists Mutual cases, Judge Leeson also considered
Philadelphia Parking Authority v. Federal Insurance Co., 385 F.
Supp. 2d 280 (S.D.N.Y. 2005), in which "the Southern District of
New York, applying Pennsylvania law, addressed whether economic
loss on its own could warrant coverage under a policy's 'direct
physical loss' provision." Id, at *27 - *28.  In concluding
that the operator of a parking garage at Philadelphia
International Airport could not recover for the significant
economic losses it sustained as a result of the downturn in air
travel following the September 11, 2001 terrorist attacks under

15

its policy with the defendant, the Southern District reasoned that:

> … the phrase "physical loss or damage" is not ambiguous since "reasonably intelligent people on considering it in the context of the entire policy would not honestly differ as to its meaning."  As stated above, the phrase "direct physical loss or damage," when considered in the context of the Insurance Policy at issue in the present case, requires *that claimed loss or damage must be physical in nature.*

Parking Authority, 385 F. Supp. 2d at 289.  Nor did the Southern District find that the at-issue policy's "civil authority" provision covered the plaintiff's economic losses either, for the reason that the relevant civil authority "did not prohibit access to Plaintiff's garages as the policy require[d]."  4431, 2020 U.S. Dist. LEXIS at *28 (quoting Parking Authority, at 289).  In the case before him, Judge Leeson went one step further and explained:

> These cases support the conclusion that under Pennsylvania law, for Plaintiffs to assert an economic loss resulting from their inability to operate their premises as intended within the coverage of the Policy's "physical loss" provision, the loss and the bar to operation from which it results must bear a causal relationship to some *physical condition* of or on the premises. The cases also indicate the existence of an element correlating to extent of operational utility – *i.e.* a premises must be uninhabitable and unusable, or nearly as such; the ability to operate in almost any capacity, even on a limited basis, precludes coverage.

Id, at *29.

In Brian Handel D.M.D. v. Allstate Insurance Co., Civ. A. No. 20-3198, 2020 U.S. Dist. LEXIS 207892, 2020 WL 6545893 (E.D.

16

Pa. Nov. 6, 2020), Judge Bartle used similar analysis to reject
Plaintiff's claim for business income losses stemming from
Governor Wolf's orders prohibiting non-life-sustaining business
operations and directing Pennsylvania residents to stay-at-home.
Despite Plaintiff's allegations that Covid-19 caused "direct"
physical damage, as well as indirect physical damage," that
rendered the property "unsafe, uninhabitable, or otherwise fit
for its intended use," and restricted the use of the property
resulting in "direct physical loss," Judge Bartle noted that
given Plaintiff's general allegation that it was "forced to
suspend or reduce business operations following an order from
Pennsylvania Governor Wolf," it was apparent that no order ever
required dental offices such as Plaintiff's to close completely
and thus the property remained inhabitable and usable, although
only for emergency procedures.  Thus, Plaintiff "failed to plead
plausible facts that Covid-19 caused damage or loss in any
physical way to the property so as to trigger coverage as set
forth in [Motorists Mutual v.] Hardinger."  Handel, 2020 U.S.
Dist. LEXIS at *8 - *9.

    In this case, the language in Plaintiff's policy just as
clearly provides that business income coverage is triggered only
when the suspension of business operations is caused by "direct
physical loss of or damage to property at the described
premises," and that "the loss or damage must be caused by or

result from a Covered Cause of Loss." While Plaintiff may be correct that the policy does not specifically define the terms "direct," "physical," "loss" or "damage," we disagree with Plaintiff's contention that this renders those terms ambiguous. Indeed, "[w]ords of common usage in an insurance policy are construed according to their natural, plain, and ordinary sense," and thus "we may consult the dictionary definition of a word to determine its ordinary usage." Kvaerner Metals Division of Kvaerner, U.S. v. Commercial Union Insurance Co., 589 Pa. 317, 333, 908 A.2d 888, 897 (2006). The ordinary dictionary definition of "damage is: "loss or harm resulting from injury to person, property or reputation." "Direct" is defined as meaning: "from the source without interruption or diversion;" while "loss" is "destruction or ruin." Finally, "physical" means "having material existence: perceptible especially through the senses and subject to the laws of nature;" and/or "of or relating to material things." See, e.g., www.merriam-webster.com/dictionary. Again, "[a]s noted above, we do not analyze insurance contract terms in isolation to ascertain the intent of the parties, but rather, must take into account the entire contractual provision at issue." Fourth Street, 583 Pa. at 456, 879 A.2d at 172.

In view of the above ordinary dictionary definitions and applying them to the entire contractual provisions in the policy

at issue, we agree that for Plaintiffs to assert an economic loss resulting from their inability to operate their premises as intended within the coverage of the Policy's "physical loss" provision, the loss and the bar to operation from which it results must bear a causal relationship to some *physical condition* of or on the premises and that the premises must be uninhabitable and unusable, or nearly as such.

Further, insofar as Plaintiff's complaint in this case also does not allege facts which plausibly suggest that Plaintiff's forced suspension of its operations and resulting loss of business income was caused by a direct physical loss of or damage to property at the described premises, we cannot find that Defendant's policy affords coverage for the losses claimed here. Moreover, as stated by Judge Leeson, the ability to operate in almost any capacity, even on a limited basis, precludes coverage. Here it does appear that although Plaintiff ceased its regular business operations on March 16, 2020, it was permitted to reopen on a partial basis several months later. (Pl's First Am. Compl., para. 61-62). Hence, to the extent that Plaintiff seeks business income damages for its post-partial-reopening time frame, we find that no coverage is afforded under the policy as written for this period either.[5]

---

[5] We also find that no coverage is afforded under the "Civil Authority" provision given that the clause applies only "[w]hen a Covered Cause of Loss causes damage

*2.* <u>Virus Exclusion</u>

In addition, even if coverage would have been afforded to Plaintiff under the language of the policy issued to it by Defendant, the Virus Exclusion would have otherwise extinguished it.  Specifically, the Virus exclusion is found on Page 9 of 53 of the Policy and it clearly states as follows in relevant part:

B. Exclusions

    1. We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.  These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

        …

        j. Virus or Bacteria

            (1) Any virus, bacterium or other microorganism that induces or is

_____

to property other than property at the described premises and both of the following apply:

    (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

    (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss

    (3) that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to

    (4) the damaged property.

capable of inducing physical distress,
illness or disease.

(2)  However, the exclusion in paragraph (1)
does not apply to loss or damage caused
by or resulting from "fungi", wet rot
or dry rot.  Such loss or damage
is addressed in Exclusion i.

(3)  With respect to any loss or damage
subject to the Exclusion in Paragraph
(1), such exclusion supersedes any
exclusion relating to "pollutants".

According to Plaintiff, "[t]he virus and bacterium
exclusions do not apply because Plaintiff's losses were not
directly caused by the sort of virus, bacterium or other
microorganism contemplated under the terms of the policy," and
"Plaintiff's losses were also caused by the entry of Civil
Authority Orders … to mitigate the spread of Covid-19."
(First Am. Compl., para. 36-37).  Again, the other courts to
consider the preceding language in the context of the current
pandemic have found it to be unambiguous and clearly applicable
"to Covid-19, which is caused by a coronavirus that causes
physical illness and distress."  Toppers v. Travelers, supra,
2020 U.S. Dist. LEXIS at *7.  See also, Handel v. Allstate,
supra, 2020 U.S. Dist. LEXIS at *10 ("[t]he policy at issue
unambiguously states that defendant will not cover loss or
damage if caused, either directly or indirectly, by any virus,
bacterium or microorganism that induces or is capable of
inducing physical distress, illness or disease"; Wilson v.

21

Hartford Insurance Co., 2020 U.S. Dist. LEXIS at *16 – *17
("[t]he Policy language here – including the defined term
'specified cause of loss' – is conspicuously displayed, clear,
and unambiguous."). And, because there is an "anti-concurrent
causation clause" which "specifically states that loss caused
directly or *indirectly* by a virus is excluded," then "Covid-19
is still a cause of the closure because the Virus Exclusion
*specifically provides for such indirect causation.*" N&S
Restaurant, Inc. v. Cumberland Insurance, supra, 2020 U.S. Dist.
LEXIS at *9 (emphasis in original). Accordingly, in light of
the clarity of the Virus Exclusion, we too find that it
unambiguously bars coverage for Plaintiff's claims due to Covid-
19.

    *B. Regulatory Estoppel*

    In an effort to avoid application of the Virus Exclusion to
bar coverage, Plaintiff invokes Pennsylvania's doctrine of
regulatory estoppel. As alleged in paragraph 38 of the First
Amended Complaint:

> Further, the Virus Exclusion was first permitted by state
> insurance departments due to misleading and fraudulent
> statements by the ISO that property insurance policies do
> not and were not intended to cover losses caused by
> viruses, and so the Virus Exclusion offers mere
> clarification of existing law. To the contrary, before the
> ISO made such baseless assertions, courts considered
> contamination by a virus to be physical damage.
> Defendant's use of the Virus Exclusion to deny coverage
> here shows that the Virus Exclusion was fraudulently
> adopted, adhesionary, and unconscionable. …

As defined by the Pennsylvania Supreme Court, "[j]udicial estoppel is an equitable, judicially-created doctrine designed to protect the integrity of the courts by preventing litigants from 'playing fast and loose' with the judicial system by adopting whatever position suits the moment." Sunbeam Corp. v. Liberty Mutual Insurance Co., 566 Pa. 494, 500, 781 A.2d 1189, 1192 (2001)(citing Gross v. City of Pittsburgh, 686 A.2d 864, 867 (Pa. Cmwlth. 1996)). "Unlike collateral estoppel or res judicata, it does not depend on relationships between parties, but rather on the relationship of one party to one or more tribunals." Id. Thus, "under Pennsylvania's doctrine of regulatory estoppel, an industry that makes representations to a regulatory agency to win agency approval 'will not be heard to assert the opposite position when claims are made by litigants such as insured policyholders.'" Hussey Copper, Ltd. v. Arrowood Indemnity Co., No. 09-4037, 391 Fed. Appx. 207, 211, 2010 U.S. App. LEXIS 17698 (3d Cir. Aug. 23, 2010)(quoting Sunbeam, supra.). "To establish regulatory estoppel under Pennsylvania law, the party seeking to invoke it must establish that the opposing party made a statement to a regulatory agency and later adopted a position contrary to the one presented to the regulatory agency." Newchops Restaurant, Comcast LLC v. Admiral Indemnity Co., Civ. A. No. 20-1869, 2020 U.S. Dist.

23

LEXIS 238254 at *20, 2020 WL 7395153 (E.D. Pa. Dec. 17, 2020)(citing <u>Simon Wrecking Co. v. AIU Insurance Co.</u>, 541 F. Supp. 2d 714, 717 (E.D. Pa. 2008)).

In paragraph 38 of the First Amended Complaint, Plaintiff refers to <u>https://www.propertycasualty360.com/2020/04/07here-we-go-again-virus-exclusion-for-covid-19-and-insurers/</u> for verification of the position taken by the Insurance Services Office ("ISO") in 2006.  That article, published on April 7, 2020, references an ISO circular submitted in the wake of the SARS[6] epidemic, dated July 6, 2006 titled "New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria."  In that circular, the ISO stated in relevant part:

> While property policies have not been a source of recovery for losses involving contamination by disease-causing agents, the specter of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing such policies may face claims in which there are efforts to expand coverage and to create sources of recovery for such losses, contrary to policy intent.
>
> In light of these concerns, we are presenting an exclusion relating to contamination by disease-causing viruses or bacteria or other disease-causing microorganisms.

The article goes on to reference another memorandum which was also filed by the American Association of Insurance Services ("AAIS") in 2006 relative to approval of the virus exclusion and which read in pertinent part:

---

[6] SARS is an acronym for Severe Acute Respiratory Syndrome.

> Property policies have not been, nor were they intended to
> be, a source of recovery for loss, cost, or expense caused
> by disease-causing agents.  With the possibility of a
> pandemic, there is concern that claims may result in
> efforts to expand coverage to create recovery for loss
> where no coverage was originally intended…. This
> endorsement clarifies that loss, cost, or expense caused
> by, resulting  from, or relating to any virus, bacterium,
> or other  microorganism that causes disease, illness, or
> physical  distress or that is capable of causing disease,
> illness, or physical distress is excluded…

In reading the foregoing statements, this Court is flatly
unable to discern how they are contradictory or contrary to the
position which Defendant takes here.  To be sure, Defendant has
denied Plaintiff's claim on the grounds that the insurance
policy which it issued was never intended and specifically did
*not* provide coverage for business closure due to a pandemic,
disease-causing agents or unorthodox transmission of infectious
materials, microbes, viruses, or bacteria.  In other words, the
claim's denial is premised upon the very same reasons advanced
to justify approval of the virus exclusion in the first place.
We therefore cannot agree with Plaintiff's argument that the
virus exclusion should now be disregarded on the basis of
regulatory estoppel.

   *C.  Reasonable Expectations*

   Plaintiff lastly asserts that "Defendant's offering of the
policy instilled a reasonable expectation in Plaintiff that it
was paying Policy premiums for business income and extra expense

25

coverage and that if its business was forced to shut down, that the Policy would provide coverage for business interruption." (Pl's Opposition to Defendant's Motion to Dismiss the Amended Complaint, at p. 23).  Thus, Plaintiff submits, Pennsylvania's Doctrine of Reasonable Expectations applies to override Defendant's denial and coverage for its claims is properly afforded.  We find this last argument to be the most persuasive.

Pennsylvania does indeed adhere to a doctrine which provides that the proper focus for determining issues of insurance coverage is the reasonable expectations of the insured.  Reliance Insurance Co. v. Moessner, 121 F.3d 895, 904 (3d Cir. 1997)(citing Tonkovic v. State Farm Mutual Automobile Insurance Co., 513 Pa. 445, 521 A.2d 920 (1987); Collister v. Nationwide Life Insurance Co., 479 Pa. 579, 388 A.2d 1346 (1978); Gilderman v. State Farm Insurance Co., 437 Pa. Super. 217, 649 A.2d 941 (1995) and Frain v. Keystone Insurance Co., 433 Pa. Super. 462, 640 A.2d 1352, 1354 (1994)).  "Under this doctrine, Pennsylvania courts have acknowledged the inherent disparity of bargaining power that exists between an insurer and insured, as well as the complexity of policy terms and conditions in insurance contracts," and that "[t]his dynamic sometimes 'forces the insurance consumer to rely upon the oral representations of the insurance agent' which may or may not accurately reflect the contents of the written document."

Downey v. First Indemnity Insurance Co., 214 F. Supp. 3d 414,
423 (E.D. Pa. 2016)(quoting Collister, 388 A.2d at 1353).

Although "in most cases, the language of the insurance
policy will provide the best indication of the content of the
parties' reasonable expectations," the courts must nevertheless
"examine the 'totality of the insurance transaction involved to
ascertain the reasonable expectations of the insured.'" Liberty
Mutual Insurance Co. v. Treesdale, Inc., 418 F.3d 330, 344 (3d
Cir. 2005)(quoting Reliance, supra.); Bensalem Township v.
International Surplus Lines Insurance Co., 38 F.3d 1303, 1309
(3d Cir. 1994)(quoting Dibble v. Security of Am. Life Ins. Co.,
404 Pa. Super. 205, 590 A.2d 352, 354 (1991)). "As a result,
even the most clearly written exclusion will not bind the
insured where the insurer or its agent has created in the
insured a reasonable expectation of coverage." Treesdale and
Reliance, both supra. This principle applies even when the
expectations are in direct conflict with the unambiguous terms
of the policy and regardless of Plaintiff's status as a
sophisticated purchaser of insurance. UPMC Health System v.
Metropolitan Life Insurance Co., 391 F.3d 497, 502 (3d Cir.
2004).

Here, Plaintiff's First Amended Complaint avers as follows
in relevant part:

22.  Plaintiff purchased the aforementioned Policy expecting to be insured against losses, including, but not limited to, business income losses at its restaurant.

27.  Plaintiff purchased the Policy with an expectation that it was purchasing a policy that would provide coverage in the event of business interruption and extended expenses, such as that suffered by Plaintiff as a result of COVID-19.

32.  Plaintiff had a reasonable expectation that the Policy's business interruption coverage applied where a civil authority forced closure, thereby barring access to the business, due to an issue of public safety in the immediate area surrounding the Insured Property.

These allegations, we find, plausibly allege facts which could give rise to a basis to afford coverage to Plaintiff if proven. Given the complete absence of an evidentiary foundation upon which to resolve this issue, we are therefore compelled to deny Defendant's Motion to Dismiss this matter and provide Plaintiff the opportunity to take discovery on this point.

### Conclusion

As explained in the foregoing pages and for the sole reason set forth above, Defendant's motion to dismiss must be denied. Of course, upon completion of discovery and development of a record on the reasonable expectations issue, Defendant is free to renew its request for the entry of judgment in its favor by filing a motion therefor under Federal Rule of Civil Procedure 56 should it determine that such a motion would be appropriate.

An Order follows.